**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>                               )<br>               Plaintiff,      )<br>                               )<br> vs.                           )<br>                               )<br> ANTHONY JOHNSON,              )<br>                               )<br>               Defendant.     )<br>_____) | Case No. 2:06-cr-00092-PMP-PAL<br><br>**REPORT OF**<br><br>**FINDINGS AND RECOMMENDATION**<br><br>(M/Suppress - #19) |

This matter is referred to the undersigned for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 on defendant's Motion to Suppress (#19). The court has considered the motion, the Government's Opposition (#20), the arguments of counsel, and evidence adduced at an evidentiary hearing conducted October 12, 2006 at 10:30 a.m. Monique Kirtley and Shari Kaufman appeared on behalf of the defendant, and William Reed appeared on behalf of the government. For the reasons set forth below, it is the recommendation of the undersigned that defendant's Motion to Suppress be denied.

**BACKGROUND**

Defendant Anthony Theodore Johnson ("Johnson") is charged in an indictment returned March 15, 2006 with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment also contains a forfeiture allegation. The indictment arises out of Johnson's arrest in the parking lot of Squiggy's Bar at 530 South Martin Luther King Boulevard in Las Vegas, Nevada, on January 21, 2006. In his motion to suppress, Johnson argues that he was unlawfully seized and detained without reasonable suspicion or probable cause when he was ordered to stop and submitted to Officer Hank's show of authority. Additionally, although the police report generated as a result of this incident indicates that Johnson voluntarily consented to a search of his person during an investigatory

detention, Johnson disputes this claim.  Johnson contends the search of his person was involuntarily obtained through duress and coercion.  He, therefore, seeks to suppress the .9mm pistol and ammunition obtained from a search of his person, and statements he made under the "fruit of the poisonous tree" doctrine.

The government opposes the motion, asserting the initial encounter between Johnson and the LVMPD officers was a consensual encounter.  Alternatively, the government argues that if the initial encounter was not a consensual encounter, it was an investigatory detention based on reasonable suspicion.  Specifically, the government contends that the involved officers had specific and articulable suspicion that Johnson had committed or was about to commit a crime based on the totality of the circumstances surrounding the encounter and the officers' training and experience.  The government asserts Johnson consented to a search of his person after telling the officers he was carrying "heat," a slang expression for a firearm.  Alternatively, the government asserts that under the totality of the circumstances, the officers had probable cause or reasonable suspicion to believe Johnson was carrying a concealed weapon in violation of Nevada state law and could lawfully search the defendant for the firearm and seize it for their own protection.

At the evidentiary hearing, the government called Officer Carlos Hank.  Johnson called two witnesses, Glenn Jefferson and Joseph Bunch.

**Testimony of Officer Carlos Hank**

Officer Hank has been employed by the Las Vegas Metropolitan Police Department ("LVMPD") as a patrol officer for six years and served in the U.S. Marine Corps for twelve and a half years prior to that.  He was on duty on January 21, 2006 on patrol at approximately 1:40 a.m. in the vicinity of Squiggy's Bar, which is located at 530 South Martin Luther King Boulevard in Las Vegas, Nevada.  Squiggy's Bar is located in the Bolden Area Command to which he is assigned to perform patrol duties.  He described the area as one involving high drug usage, high gang activities, and a generally high crime area.  The bar itself is known as a gang hangout where a number of murders and attempted murders have occurred.  As a result, his patrol area command tries to visit the bar on a regular basis, and concentrates patrols in this area to deter crime.

///

On January 21, 2006, he encountered numerous individuals in the parking lot of Squiggy's Bar. He and other officers came around the south corner of the bar and smelled an odor of marijuana. It was not difficult to pinpoint where the odor was coming from. He saw a group of approximately four people, ten to fifteen feet from the front door of the bar and could see smoke right in front of the group of four people. He and his fellow officers approached the group of four people and basically asked them what was going on to investigate the smoking of marijuana. Two of the four persons in the group where the smoke was emanating started to walk away. One of the two men who started to walk away was the defendant, Anthony Johnson. Hank contacted Johnson while other officers made contact with the other individuals. Hank immediately asked Johnson words to the effect "what's going on" and immediately thereafter, whether he had any drugs, weapons, or anything like that on him. Johnson responded "I got the heat" which means, in street language, that Johnson had a firearm. As Johnson made the statement "I got the heat," Hank observed Johnson pull at the waistband of his pants with his left hand. As a result, Hank told Johnson to put his hands behind his back and placed him in handcuffs. He took this action to make sure the officers on the scene were safe. Hank patted down the exterior of Johnson's clothing and felt a hard object which he suspected was a gun. Hank motioned to Officer Usiak with his hand to indicate Johnson had a gun. At this point, Usiak took control of Johnson as the contact officer, and Hank became the cover officer. Hank asked Johnson for permission to search his person by stating words to the effect "do you mind if I search you?" Johnson shrugged his shoulders and said yes. Officer Usiak also asked Johnson for permission to search his person for the weapon and Johnson agreed. A black semi-automatic firearm was recovered from Johnson's person.

Hank reiterated that on his initial contact with Johnson, he asked Johnson what was going on, and whether he had any drugs, weapons, or anything like that. Johnson responded "I got the heat." Hank then handcuffed him for officer safety, patted him down, and asked for permission to search. At no point during his encounter with Johnson did Hank unholster his weapon, and he did not believe any other officer at the scene did.

On cross examination, Hank testified he reviewed a police report written by another officer in preparation for his testimony. There were four officers at the scene of Squiggy's Bar the night of this arrest. As he rounded the corner of Squiggy's Bar, the first thing that alerted his attention was the smell

1  of marijuana. He estimated the group of four people were approximately thirty feet away from him
2  when he first smelled the odor of marijuana. It took under a minute to walk toward them and make
3  contact with the group of four. He did not see anyone smoking marijuana, or see a marijuana cigarette.
4  He saw smoke coming from the group of people where Johnson was standing. Smoke was all around
5  Johnson, but Hank could not say it was coming from his mouth or nose. Hank was not aware of anyone
6  that night being arrested for marijuana, and no marijuana was found. No marijuana was found on
7  Johnson that night.

8  　　　The first officer to approach the group of individuals was Officer Gray. Hank estimates he was
9  approximately three feet from Gray when they first made contact with the group. Hank described the
10 encounter as "a dynamic situation." As the officers approached the group from where this smoke was
11 emanating, two of the individuals started to walk away while two remained. Hank did not observe the
12 two individuals who walked away from the group of four commit any crime, other than being in the
13 area of the marijuana smell and smoke. He made contact with Johnson to investigate the marijuana.
14 The smell of marijuana was very strong. No one was arrested for possession of marijuana in the
15 parking lot that night, but "that doesn't mean it wasn't there." When asked whether someone would
16 have been arrested if marijuana was found, Hank responded "possibly."

17 　　　As Hank approached Johnson, he asked "hey, what's going on." Johnson turned around to face
18 Hank. Hank asked Johnson whether he had any weapons, drugs, or anything like that on him at this
19 time. When he made contact with Johnson, it was to investigate marijuana. In Nevada, it is not illegal
20 to carry a firearm or weapon, but is illegal to carry a firearm concealed without a permit. It is also
21 illegal for a felon to possess a firearm, but Hank had no information Johnson was an ex-felon as he
22 approached Johnson in the parking lot. All four officers who were in the parking lot that night were in
23 uniform and armed. The officers were not responding to a call for service at the bar. However, Hank
24 testified that the bar owner had requested LVMPD to patrol this area to deter crime because he feared
25 losing his liquor license. Hank believed there were two owners of the bar, but did not recall a name.
26 When Johnson was stopped, Hank did not know whether Johnson had a permit to carry a concealed
27 weapon, and did not initially ask whether Johnson had a permit.
28 ///

1    Hank read a portion of Defendant's Exhibit "2," the Declaration of Arrest, for this incident to
2 refresh his recollection before testifying. The report reflects that the only person arrested that night was
3 Johnson.  The LVMPD communications center printout for this event number was marked as
4 Defendant's Exhibit "1." The computer printout shows the calls generated from Squiggy's Bar at
5 530 South Martin Luther King Boulevard that night, and sequence of events as reported by dispatch.
6 The dispatch report shows that his unit arrived at 1:09 a.m. The radio communication report states
7 "413 in cust," meaning a 413 (firearm), was in police custody. Hank testified that 1:09 a.m. was the
8 time the gun was seized and that Johnson was not arrested until 1:40 a.m. Johnson was detained while
9 officers investigated. The dispatch or communications center's log indicates Johnson was placed in
10 custody at 1:36 a.m. Hank was still at the scene at 1:51 a.m. according to the dispatch log.

11    Generally, LVMPD officers patrol alone. However, this was a night of heavier patrol
12 concentration in high crime areas so he and Officer Usiak were patrolling together. Hank conceded
13 there is nothing in the dispatch log indicating the officers received a service call for the bar, or that the
14 bar owner initiated the call.

15    The dispatch report does not reflect that anyone had illegal controlled substances that night.
16 Hank explained that generally LVMPD officers state the more specific offense, and/or the higher level
17 offense. The code "446" is for controlled substances, and there is no "446" code on the log. Page 2 of
18 the arrest report reads: "On 01/21/06 at approximately 0140 hours, officers . . . were in the area of
19 520 South Martin Luther King, Las Vegas, Nevada." The arrest report does not reflect what the officers
20 were doing at 1:09 a.m. He reiterated that the reference in the dispatch log to a 413 in custody at
21 1:09 a.m. meant that a gun was in custody, and did not mean that a person had been arrested. The
22 purpose of a 413 report to dispatch is to let officers know that a gun is in custody. The person who had
23 the gun was detained, but not arrested. The call was made because a person had admitted he had a gun,
24 the gun was found, and to announce to other officers that the gun was in custody. The Declaration of
25 Arrest report does not reflect that the officers were on the scene at 1:09 a.m., and contains a reference to
26 1:40 a.m.
27 / / /
28 / / /

5

1    On redirect examination, Hank testified he did not author the report.

2    The court asked Hank to clarify his response "possibly" to the defense question on cross examination about whether, if marijuana had been found, someone would have been arrested. Hank responded that officers have discretion whether to cite or arrest for less than an ounce of marijuana, depending on the circumstances. Here, the officers had a more serious offense, a person with a gun. Additionally, it is common for officers to smell marijuana but upon investigation no marijuana is found. Often times people swallow marijuana so they will not be found in possession.

    On recross examination, Hank acknowledged no one was cited for marijuana that night. If marijuana had been found, it would not have been left on the scene, but would have been impounded. He could not say one way or the other whether anyone swallowed marijuana that night.

**Testimony of Glenn Jefferson**

    Mr. Jefferson has been employed as a security guard at Squiggy's Bar for approximately two years. His duties include crowd control, parking lot searches, patting down people or conducting pat searches, and checking I..D.s at the front door. He was working the 11:00 p.m. to 7:00 a.m. shift and got to work at approximately 10:45 p.m. on January 21, 2006. He was working the front door that night. He knows the defendant, Anthony Johnson, and has seen him in the bar. Johnson was in the bar that night and had a couple of drinks. Jefferson saw him leave the bar, going down the walkway. There are always lots of people on the walkway.

    As a security guard at Squiggy's, the walkway is always full of people, and he is always yelling at people to get off the walkway, to disperse and stop loitering. Jefferson saw about four Metro officers, two of them were behind him. Johnson had just passed Jefferson when the officers arrived. Jefferson was at the door of the bar, and there were four or five people on the sidewalk. Jefferson was trying to disperse the crowd when Metro arrived. Jefferson said "Metro's here," and the crowd dispersed. When Metro arrived, the crowd of people was between the barbershop and the furniture store, a distance of approximately one hundred feet down the sidewalk. Johnson was about one hundred and two feet down the sidewalk. Jefferson stayed in the door and could not hear anything, but two of the officers made contact with Johnson. The officers had Mr. Johnson detained for about an hour. Jefferson could not leave his post to find anything out, and just continued with his duties. The

1  officers made contact with Johnson about ten seconds after Johnson left the bar.  Metro is always in the
2  parking lot checking people.  Jefferson testified "I guess they're looking for little gang bangers."  "They
3  pretty much judge you by your attire."  He also testified "I guess they might know a lot of these
4  people."  The officer who just left the courtroom is one of the officers who regularly patrols the area.
5  The officer usually stands behind Jefferson at the door of the bar at Squiggy's and puts on his gloves.
6  There are four Metro officers who regularly patrol, and he described them as "ball busters," who are
7  intimidating type of guys.  Jefferson did not observe whether Johnson was handcuffed when the officers
8  approached him.  Jefferson believed that three officers surrounded Johnson, and two of them
9  approached Johnson from behind.
10         On cross examination, Jefferson testified that the bar is busy, particularly late at night.  The bar
11 has a sixty-five person capacity and sometimes more people want in than are allowed, especially on
12 special nights or concert nights.  This was one of those nights.  This creates some problems when
13 people congregate outside on the sidewalk and in the parking lot.  When asked whether some people in
14 the parking lot smoke marijuana, Jefferson responded  "everywhere, everywhere."  Jefferson did not
15 know whether Johnson had been drinking in the bar that night.  Johnson's sister used to work at the bar
16 and for some reason Johnson was there that night.  Jefferson chatted with Johnson that night before he
17 left.  Jefferson had patted Johnson down that night, but did not find a gun on him.
18         Jefferson pats everyone down who enters the bar.  There are two security guards at the door.
19 One "wands" and one pats.  Patrons are patted down for weapons to keep them safe.  He has found
20 people with knives on the premises, and when he finds people with guns, he tells them to leave.  He
21 does not call the police, but tells people with guns that they cannot enter the bar.  This was a busy night,
22 and a lot of people were congregating on the sidewalk, and there were some people in the parking lot
23 when Johnson left the bar.  Jefferson got a knock on the door by a patron, and he opened the door to
24 check her purse.  When he opened the door, that is when he noticed two police officers behind him.
25 Jefferson saw Johnson walking up the sidewalk and police officers coming around the corner when
26 Jefferson opened the door for the other patron.
27         There were people on the sidewalk, and Jefferson warned the people on the sidewalk Metro was
28 coming.  When asked whether he smelled marijuana that night, Jefferson again responded that he

1  smelled marijuana, cigarettes, alcohol, "everything." Metro made contact with a group of individuals.
2  The ones that just stood there were not detained, but Johnson was. Metro had not been at the bar earlier
3  that night before Johnson was detained. Johnson's back was to Jefferson when the officers made
4  contact with him, so Jefferson could not tell if Johnson was talking to people or whether he was
5  "congregating" with people before Metro stopped him. Jefferson stood and "gazed" at the door of the
6  bar for about 45 seconds while the police approached and made contact with Johnson.
7      On redirect, Jefferson testified that the two officers had Johnson go to the front of the patrol car.
8  In response to a question from the court, Jefferson clarified that he did not see the officers place
9  Johnson on the car, but had him stand in front of it.
10 **Testimony of Joseph Bunch**
11     Mr. Bunch is the owner of two bars doing business as Squiggy's, one of which is located at
12 530 South Martin Luther King Boulevard. He is periodically at the bar at different hours and
13 sometimes works there when the bartenders do not show up. On January 21, 2006, he did not call the
14 police to come to the bar. He was not at Squiggy's Bar on January 21, 2006. Metro frequently walks
15 through the parking lot area, especially on weekends, sometimes as much as three or four times a night.
16                                    **DISCUSSION**
17     The Fourth Amendment secures "the right of the people to be secure in their persons, houses,
18 papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth
19 Amendment protects reasonable and legitimate expectations of privacy. Katz v. United States, 389 U.S.
20 347 (1967). The Fourth Amendment protects "people not places." Id. Evidence obtained in violation
21 of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the
22 poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).
23     In determining whether a Fourth Amendment violation has occurred, and, if so, whether
24 suppression is warranted, the court begins its analysis with the question of whether the encounter
25 between Johnson and the officers was a seizure. For Fourth Amendment purposes, a seizure of a person
26 occurs when a law enforcement officer in some way restricts the liberty of a citizen, either by physical
27 force or show of authority. Florida v. Bostick, 501 U.S. 429, 434 (1991). A citizen's liberty is
28 restrained if "taking into account all of the circumstances surrounding the encounter, the police conduct

would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Id. at 437, quoting, California v. Hodari D., 499 U.S. 621, 628 (1991). The determination of whether an individual has been seized for Fourth Amendment purposes is made by examining the totality of all the circumstances surrounding the encounter. Florida v. Bostick, 501 U.S. at 437-38. A reasonable person test is an objective one and "presupposes an *innocent* person." Id. at 437-38 (emphasis in original). "A seizure occurs either when a suspect is physically forced to stop or when the suspect submits to the officer's show of authority." United States v. Hernandez, 27 F.3d 1403, 1406, citing California v. Hodari D, 499 U.S. 621 (1991).

      The government argues in its response that the encounter between Johnson and the police in the parking lot was a consensual encounter. While Officer Hank's initial question "what's going on?" suggests he attempted to make the encounter consensual, the totality of the circumstances persuades the court this was a seizure within the meaning of the Fourth Amendment. Officer Hank's testimony described the police presence in the parking lot of Squiggy's Bar that night as part of a heavy patrol concentration in a high crime area using two-man teams. Four officers rounded the corner of the bar as a group and made contact with a group of people who drew their attention. At least two officers approached Johnson when he left the group of four. Hank approached Johnson, who had left the group and was walking away, to investigate the odor of marijuana. Officer Usiak assisted Hank almost immediately. Mr. Jefferson described the four officers who regularly patrol the bar, and who were present that evening as intimidating types. Officer Hank's demeanor while testifying exuded both confidence and authority. The court finds that a reasonable person in Johnson's position would not have thought he was at liberty to ignore the police presence and go about his business when Officer Hank and his partner made contact with him in the parking lot of Squiggy's Bar that evening. Johnson submitted to Officer Hank's show of authority and was seized for Fourth Amendment purposes.

      Having found that the encounter between Johnson and the officers was a seizure, the court must determine whether there was reasonable suspicion to support it. U.S. v. Hernandez, Id. The Fourth Amendment permits a police officer to conduct a brief investigatory stop when the officer has reasonable articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). Reasonable suspicion is a less demanding standard than probable cause and requires a showing

1  considerably less than preponderance of the evidence.  United States v. Sokolow, 490 U.S. 1, 7 (1989).
2  However, the Fourth Amendment requires at least a minimal level of objective justification for making
3  the stop.  Id.  The Ninth Circuit defines "reasonable suspicion" as, "specific, articulable facts which,
4  together with objective and reasonable inferences, form the basis for suspecting that the particular
5  person detained is engaged in criminal activity."  United States v. Rojas-Millan, 434 F.3d 464, 468-69
6  (9th Cir. 2000), quoting, United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000).  A police
7  officer "is entitled to rely on his training and experience in drawing inferences from the facts he
8  observes, but those inferences must also 'be grounded in objective facts and be capable of rational
9  explanation.'"  Lopez-Soto, 205 F.3d at 1105, quoting, United States v. Michael R., 90 F.3d 340, 346
10 (9th Cir. 1996).  The officer must be able to articulate more than an "inchoate and unparticularized
11 suspicion or 'hunch'" of criminal activity.  Terry, supra, at 27.

12       The court finds Officer Hank had reasonable suspicion to make a *Terry* stop to investigate the
13 strong odor of marijuana and smoke he observed emanating from the group of four people with whom
14 Johnson was standing.  Although defense counsel emphasized in cross examination that no one was
15 cited or arrested for possession of marijuana that evening, and no marijuana was seized, suggesting the
16 officers had different motives for making contact with Johnson, the court found Officer Hank credible
17 that as he turned the corner of the bar, he smelled a strong odor of marijuana and saw smoke
18 surrounding the group of people with whom Johnson was standing.  Hank's testimony was bolstered by
19 the testimony of Mr. Jefferson who testified that marijuana was "everywhere" around the bar and its
20 environs, including the parking lot that night.  Thus, even if, Hank and his fellow officers wanted to
21 stop Johnson for other reasons, the Supreme Court made it clear in Whren v. United States that
22 "[s]ubjective intentions play no role in ordinary, probable-cause analysis," and that "we have been
23 unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual
24 officers."  517 U.S. at 813.  See also, Devenpeck v. Alford, 543 U.S. 146 (2004) ("[T]he subjective
25 reason for making the arrest need not be the criminal offense as to which the known facts provide
26 probable cause.").  As the Ninth Circuit recently observed in United States v. Willis, 431 F.3d 709, 716
27 (9th Cir. 2005), "[u]nder Whren, [courts] cannot second-guess the reasons for the officer's stop."  The
28 / / /

court finds Officer Hank had reasonable suspicion that criminal activity was afoot at the time he seized Johnson in the parking lot and initiated an investigatory detention.

Next, Johnson argues that the officers on this scene lacked reasonable suspicion to believe that he was armed and dangerous, and, therefore, that the search of his person which recovered the weapon violated his Fourth Amendment rights. The court concludes otherwise. Here, Officer Hank rounded the corner of the bar and made contact with Johnson, one of two people who left the group from whom the odor of marijuana and smoke were observed. Officer Hank asked "What's going on?" and whether Johnson had any weapons, drugs, or anything like that on him in a very quick exchange while approaching Johnson in the parking lot. Johnson responded with a slang expression, indicating he had a gun, and tugged at the waistband of his pants with his left hand. Hank immediately commanded Johnson to put his hands behind his back, placed him in handcuffs, and conducted a pat down of the exterior of his clothing which revealed a hard object consistent with a gun. Hank knew that the bar was a high-crime area in which police conduct concentrated patrols to deter crime; was a known gang hangout where gang activities, murders and attempted murders have occurred; and was an area with a high incidence of drug activity. Given everything Hank knew, his question to Johnson which elicited the response Johnson was carrying a gun was reasonable.

Once Johnson informed Hank that he was carrying a gun, the officers were entitled to seize the gun to avoid any possibility that Johnson would use it against them. Willis, 431 F.3d at 717 (finding officer who merely asked if suspect had anything the officer should know about is a reasonable question to ensure the officers' personal safety). The "touch stone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citations omitted). The court finds that the officers had reasonable suspicion that Johnson was armed and, under the circumstances of the encounter, potentially dangerous to conduct a pat down and seize the gun to ensure officer safety.

Finally, during the evidentiary hearing, counsel for Johnson suggested the officers lacked reasonable suspicion that Johnson was committing an offense by possessing the gun because the officers were not aware Johnson was a convicted felon, or whether he had a permit to carry a concealed

weapon. Where, as here, the officers had reasonable suspicion to initially detain Johnson to investigate the odor of marijuana, found a gun after Johnson told the officers he had one and pulled at his waistband, and the officers recovered the gun in a pat down search, it was objectively reasonable to detain Johnson to investigate whether his possession of a concealed firearm was lawful. Once the gun was secured, the officers at the scene conducted a records check, confirmed that Johnson was a convicted felon who did not have a permit to carry a concealed weapon, and developed probable cause to arrest him for felon in possession of a firearm and carrying a concealed weapon.

## CONCLUSION

Under the totality of the circumstances presented here, the court finds Johnson's initial detention to investigate the odor of marijuana was based on reasonable suspicion. Given everything the officers knew concerning the high-crime area, high incidence of gang activity, murders and attempted murders which had occurred at the scene, Officer Hank's question to Johnson about whether he had a weapon or drugs was reasonable. When Johnson responded he had a gun and pulled at his waistband, it was objectively reasonable to search Johnson's person and seize the weapon for officer safety. Seizing the gun was a reasonable method to protect the officers from a potentially dangerous situation. Having found the search of Johnson's person and seizure of the weapon reasonable, the court need not decide whether Johnson consented to a search of his person and seizure of the gun. Suppression of the gun the officers recovered was not the fruit of an illegal search or seizure, and the evidence need not be suppressed.

For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that defendant Anthony Johnson's Motion to Suppress (#19) be DENIED.

Dated this 28th day of November, 2006.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE